UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

RENAISSANCE NUTRITION, INC.,

                Plaintiff,

v.                                     **DECISION AND ORDER**
                                                  06-CV-380S

GEORGE JARRETT and
DAN KURTZ,

                Defendants.

## I. **INTRODUCTION**

Plaintiff, Renaissance Nutrition Inc., commenced this action under 28 U.S.C.§ 1332. Renaissance, a Virginia corporation with its principal place of business in Pennsylvania, alleges former employees and diverse defendants Dan Kurtz and George Jarrett breached non-compete and confidentiality agreements with Plaintiff. These agreements also serve as the basis for Plaintiff's second claim – that each defendant purposely interfered with the other defendant's contract with plaintiff. Third, Plaintiff alleges that Defendants tortiously interfered with Plaintiff's business contacts and relationships. Finally, Plaintiff claims that Defendants breached their respective duties of loyalty owed to Plaintiff as employees. Presently before this Court is Defendants' motion for summary judgment on each of Plaintiff's claims. For the following reasons, Defendants' motion is denied.

## II. **FACTS**

Renaissance Nutrition Inc. is a vitamin and mineral premix company that sells nutritional products for cows and provides consulting services to dairy farmers. (Docket No. 92, Brown Aff. ¶ 2.)  Plaintiff develops and provides trace minerals and vitamins that are inserted into the food supply of lactating cows to support and maximize milk production. (Docket No. 92, Brown Aff. ¶ 2.) Plaintiff sells its products through sales representatives

who are assisted by nutritionists. (Docket No. 92, Brown Aff. ¶ 2.) The nutritionists are vital to the company. They develop premix rations or diets tailored to Plaintiff's customers. (Docket No. 92, Brown Aff. ¶ 3.) Defendants Dan Kurtz and George Jarrett acted as both nutritionists and managers for Renaissance. (Docket No. 92, Brown Aff. ¶ 4.)

By the time Jarrett left Renaissance in 2006, he was second-in-command; he dealt with product development, pricing, and marketing. (Docket No. 92, Brown Aff. ¶ 8.) Kurtz was a regional manager, also an important position within Renaissance; he oversaw salesmen, developed new accounts and provided nutritionist services. (Docket No. 92, Brown Aff. ¶ 2.) Defendants resigned in late May 2006 with plans to begin their own nutritional company, Cows Come First ("CCF").

**A.    Plaintiff's Version**

Renaissance contends that Defendants, acting in concert, developed a scheme to resign from Renaissance and start CCF to compete with Plaintiff. Renaissance contends that Defendants hatched this plan while employed by Renissance, that Defendants met on Renaissance property to discuss their plan, that Defendants used unwitting Renaissance information technology ("IT") staff to transfer information from Renaissance laptops to Defendants' personal laptops, and that Defendants used company data and information to steal clients.  Renaissance contends that as a result of Defendants' new business, Renaissance lost twenty-one customers.[2]  All this, Renaissance alleges, violated two separate agreements between Defendants and Plaintiff. Identical copies of the first

---

[2] They include: Dickson Farms, Tom Preischel, Greenwood Dairy, Wills Dairy, J&J Farms, Bezon Farms, Woodcrest, Van Raay Dairy, Stardust Dairy, Tom Benner, Trotacre Farm, Burbick Bros., Lowmiller Farms, Crist Dairy, Joe Weaver, Herman Lechman, Witmer Farms, Berkell Farms, Wayne Dilley, John Hahn, and Mike Cameron. (Docket No. 92, Brown Aff. ¶¶ 18, 20.)

agreement, the Renaissance Management Agreement ("RMA"), were signed by Kurtz and Jarrett in December 1991. The agreement reads:

> [Defendant] agrees that, except as required by his responsibilities to Renaissance, he will not at any time, either during the term of or after termination of his employment with Renaissance, regardless of the reasons for termination, either use, disclose or communicate to any person, firm or corporation, directly or indirectly, or in any manner, Confidential Renaissance Information. Management Employee acknowledges and agrees that unauthorized release or disclosure of Confidential Renaissance Information will gravely damage the conduct of Renaissance's business, and harm Renaissance's goodwill. Prior to making any disclosure of any Confidential Renaissance Information, whether pursuant to any subpoena, discovery demand, court order, or other means, [Defendant] agrees to give immediate telephone as well as prompt written notice to Renaissance of the impending disclosure, sufficiently in advance to allow Renaissance to seek protection, if so advised.

(Docket No. 93, Exhibits 1, 5).

In 2002, Kurtz and Jarrett also signed identical copies of a second agreement, the Supplemental Renaissance Management Agreement ("SMRA"). In consideration, Renaissance paid each defendant $50,000. (Docket No. 93, Exhibit 3.) It reads:

> [Defendant] agrees that for a period of two (2) years from the termination of his relationship with Renaissance that he, nor any company that he is an officer, director, shareholders, agent, employee, representative, or part owner of shall service, solicit the business of, make sales calls on, promote, market, or sell directly or indirectly any product or service similar to those of Renaissance or do independent consulting work for pay or free for any of his customers, his distributors' customers, Renaissance's customers, or those that have been customers in the past six (6) months in the market area covered by Renaissance Nutrition, Inc. If Craig Brown would ever sell the Renaissance business, the period of restriction in this agreement would be lowered to one (1) year from the date of [Defendant's] termination of his relationship with

3

Renaissance no matter who does the terminating.[3]

(Docket No. 92, Brown Aff. at ¶¶ 7,8; Docket No. 93, Exhibits 3, 6).

According to Plaintiff, evidence of Defendants' plan began to surface when Jarrett contacted Ruth Gunnett, an IT specialist employed by Renaissance. (Docket No. 93, Exhibit 11.) Jarrett wanted to buy a laptop and asked for Gunnett's assistance in choosing one. (Docket No. 93, Exhibit 11.) Plaintiff posits that Jarrett wanted to purchase this computer to use at CCF.[4] After some discussion, Jarrett decided on a computer, and asked Gunnett to order it. At the last minute, he suddenly tripled the order, asking Gunnett to order three of the very same computers. (Docket No. 93, Exhibit 11.) Although Gunnett was puzzled by this, she ordered the computers. (Docket No. 93, Exhibit 11.) Later, Jarrett asked another IT consultant to help him transfer files from his old Renaissance computer to his new one. (Docket No. 94, Exhibit 34.) Plaintiff alleges that among the files transferred were its proprietary customer lists and diet formulations.

Although Gunnett was puzzled by Jarrett's triple laptop order, Plaintiff is not. Plaintiff believes the laptops were ordered for Jarrett, Kurtz, and Mark Wenger, a salesman for Plaintiff in Virginia. Plaintiff believes that Mark Wenger was wooed by Jarrett and Kurtz to join them in their new venture, CCF. They point to numerous phone calls between Jarrett and Wenger and an in-person visit. (Docket No. 93, Exhibit 14.) Wenger went so far as to resign from Renaissance in furtherance of this plan. (Docket No. 92, Brown Decl. ¶ 13.) But

---

[3] The grammatical construction of this agreement is flawed. "Nor" is the only negative used in the whole agreement. "Neither" does not precede "he" in the cited paragraphs. However, it is clear from the moving papers that both parties believed it to be a restrictive covenant, not, in defiance of logic, an agreement ordering Defendants to compete with Plaintiff.

[4] It is undisputed that Jarrett purchased all three computers with his own money.

4

when Wenger learned that Craig Brown, the president of Renaissance, might pursue litigation pursuant to the non-compete agreement, Wenger got cold feet and the two struck a deal whereby Wenger would return to Renaissance. (Docket No. 92, Brown Decl. ¶ 14.)

Defendants, however, stuck to their plan. Plaintiff believes it has connected Defendants' resignations and its loss of customers. First, Renaissance points to Kurtz, who they believe developed a relationship with Commodity Brokers International ("CBI"), a competitor of Renaissance, while still employed by Renaissance. To support this contention, it relies on a receipt detailing $4,454.40 in commissions CBI paid Kurtz and Kurtz's subsequent deposit of the identical amount in his bank account. (Docket No. 93, Exhibit 8; Docket No. 93, Exhibit 10.) It believes that Kurtz developed feed formulas for Eastwood and Visser farms using CBI's products instead of Renaissance's product. (Docket No. 45-2, Carlin Aff., ¶ 9-10.) Then, after Kurtz left Renaissance, he continued to use CBI products to develop products for what became Renaissance's former customers. Renaissance contends this was a double blow: not only did Kurtz take business from Renaissance while he was an employee, but he also used his relationship with CBI to further harm Renaissance after he resigned. (Docket No. 92, Brown Aff. ¶ 9-10.)

Kurtz also developed diets for thirteen of Plaintiff's customers, using, in part, newly formulated CCF products. (Docket No. 93, Exhibit 18.) Kurtz admitted to creating these diets, but referred to them as "play diets." (Docket No. 106-2, Kurtz Decl. ¶ 5.) Kurtz used this term "play diet" to refer to diets that he hoped to present and sell to Plaintiff's customers after he left Renaissance. (Docket No. 95-2, Exhibit 1, pp. 257.)[5]

---

[5] But, Kurtz explains, they were only "play diets" because he never intended to sell them unless he got prior-approval from Craig Brown. (Docket No. 95-2, Exhibit 1, pp. 254-260.)

Plaintiff also alleges that Kurtz had unfair and illegal dealings with Tom Benner, one of Plaintiff's former customers. On May 16, 2006, Kurtz contacted Plaintiff's credit manager and requested that Renaissance send Benner a refund check for Benner's pre-payments. (Docket No. 93, Exhibit 19.) Although Plaintiff characterizes this as a strange and infrequent request, Plaintiff did as requested. Plaintiff believes this request was the result of Kurtz's actions directing Benner's business to CCF and CBI and away from Renaissance. What is more, Kurtz also created a "play diet" just three days later. (Docket No. 95-2, Exhibit 1, pp. 254-259; Docket No. 93, Exhibit 33.)

Then, on June 1, 2006, following Kurtz's resignation, Benner called and canceled all future deliveries. (Docket No. 93, Exhibit 19.) Benner admitted that he knew Kurtz through his long relationship with Renaissance and that he switched his business to CBI, the mill with whom Kurtz had allegedly been "double-dealing" before resigning. (Docket. No. 82, Benner Decl. ¶¶ 4-7.) Plaintiff believes this is more than a coincidence.

Finally, Plaintiff cites a discussion between Kurtz and Larry Bock, a Renaissance sales representative. Kurtz told Bock that he was discouraged with Renaissance and that its prices were too high, rendering it difficult to sell products. (Docket No. 93, Exhibit 21.) Prefaced with a caution that Larry not tell anyone else at Renaissance, Kurtz intimated that he was going to take several of Larry's customers and that he was going to steal almost all of the customers of another sales representative, Jon Grimm, who sold Plaintiff's product in Western New York. (Docket No. 93, Exhibit 21.)

As for Jarrett, Plaintiff alleges that he diverted Renaissance customers away from Renaissance through Patrick O'Brien. According to Plaintiff, O'Brien was a commodities broker, not a nutritionist. "Overnight" Plaintiff maintains, O'Brien suddenly became a

nutritionist and began to service several of Renaissance's former customers. (Docket No. 95-4, Exhibit 3, pp. 153-154.) Renaissance believes O'Brien was a strawman, used by Jarrett to hide his dealings. Renaissance relies on several connections between Jarrett and O'Brien.  First, Jarrett bought O'Brien software used to formulate diets. (Docket No. 94, Exhibit 31.) This is the very software used by Renaissance and furnished to Jarrett for this purpose. Jarrett also assisted O'Brien in using the software. (Docket No. 95, Exhibit 3, pp. 54-55.)  Then, immediately after Jarrett's resignation, Greenwood Dairy began to use O'Brien services; Greenwood admits they utilized O'Brien's services solely on the basis of Jarrett's recommendation. (Docket No. 95, Exhibit 8, p 24; Docket No. 94, Exhibit 29.)  In fact, Plaintiff contends, O'Brien's had only six customers, all of whom were former Renaissance customers. (Docket No. 95, Exhibit 3, pp. 153-154.) Finally, Jarrett received a monthly commission check from O'Brien. (Docket No. 94, Exhibit 29.)

Plaintiff also alleges that Jarrett set up a similar system with Mike Maloney. It claims that like O'Brien, Maloney was too inexperienced to handle Woodcrest Diary, a large New York farm, and was therefore relying on Jarrett to develop its diets. (Docket No. 92, Brown Aff. ¶ 22.) Maloney admits Woodcrest asked him to seek Jarrett's advice. (Docket No. 95, Exhibit 4, pp. 183-184.)

B.     **Defendants' Version**

Defendant's do not deny that they aspired to create a company called Cows Come First, nor do they deny that they once held high-level positions in Renaissance, Inc. But Defendants dispute most other material allegations: that there was a scheme, that there was a clandestine late night meeting at Renaissance headquarters, that they solicited Renaissance customers, that they wooed Mark Wenger, and that they stole Renaissance's

7

information. Most importantly, they deny stealing any of Plaintiff's customers.

### 1.   **Laptops and Mark Wenger**

Jarrett admits buying the laptops in question and asking Ruth Gunnett for help. But he maintiains that he bought the laptops for his personal use, and took no confidential information from the computers. (Jarrett Decl. ¶ 13.) He admits selling a laptop to Mark Wenger, but he states that this was not his intention when he bought it. He initially bought the laptop for his son, but his son's business was "done," and he merely sold it to Mark as a friend. (Docket No. 103, Exhibit A, p. 102.) Defendants also state that Wenger, Kurtz, and Jarrett were friends and colleagues, not co-conspirators and that Wenger's resignation and subsequent rescindment of that resignation are unrelated to this lawsuit. (Docket No. 77-2, Kurtz Decl. ¶ 15; Docket No. 78-3, Jarrett Decl. ¶ 12.)

As for the copied files, Defendants claim they wanted to save information in the event of future litigation. Both were concerned about the possibility of testifying in lawsuits between dairy farmers and nutritional providers and did not want to be unprepared. (Docket No. 76-3, p. 229.) Further, Plaintiff's are wrong to complain about any deleted information on the Renaissance computers. Defendants deleted only out-dated information about former customers from Renaissance computers out of concern for those customers' privacy. (Docket No. 76-3, pp. 5-8; Docket No. 76-3, pp.75-76.)

### 2.   **Larry Bock**

Kurtz admits discussing his future plans with Larry Bock. But he maintains he did so only out of friendship and made no threats to Larry's customer base. He also denies communicating any plan to steal customers from Jon Grimm. (Docket No. 60, Def. Ans. ¶

44.)

### 3. CBI and Tom Benner

Kurtz maintains that his relationship with CBI was not an act of disloyalty. (Docket No. 106-2, Kurtz Decl. ¶ 6.) Eastwood and Visser farms approached him, not vice versa, and only after they made it clear that they would not do business with Renaissance did Kurtz agree to formulate diets for them using CBI. Kurtz claims he created these diets on his own time and, in fact, used some of Renaissance's product, earning Renaissance money that it would not have received otherwise. (Docket No. 106-2, Kurtz Decl. ¶ 6.) Kurtz also maintains that Benner requested the refund noted by Plaintiff because Benner needed the money to account for falling milk prices. (Docket No. 106-2, Kurtz Decl. ¶ 4.) Further, the "play diet" Kurtz created for Benner was simply hypothetical and it was never sold to Benner. (Docket No. 106-2, Kurtz Decl. ¶ 5.)

### 4. CCF's Products and Lost Customers

Defendants state that they never used any Renaissance software or data to develop their new products. Instead, those products were developed from the knowledge and experience developed over the many years they worked in the industry. (Docket No. 76, Sanders Aff. ¶ 30.) They also state that they did not induce any farmers to leave Renaissance. (Docket No. 78-3, Jarrett Decl., ¶¶ 4-7.)

Defendants maintain they never presented a diet containing a competitor's product to any of the customers at issue, either before or after they resigned. (Docket No. 76, Sanders Aff. ¶ 30.) Defendants claim that the diets they formulated while working for Renaissance were merely "play diets" that were never presented to Renaissance's

9

customers. (Docket No. 106-2, Kurtz Decl. ¶5.) Defendants deny soliciting any of the farmers for their business; they simply informed a few farms that they intended to begin a nutritional business.[6] (Docket No. 76-3, p. 81.) Defendants claim that they never spoke negatively about Renaissance. (E.g. Docket No. 82, Benzon Decl. ¶ 25.)

Finally, Defendants deny any responsibility for Renaissance's lost business. According to Defendants, the farms that did terminate their relationship with Plaintiff did so for unrelated business reasons such as cost, or dissatisfaction with Kurtz's and Jarrett's replacements. (Docket No. 78-2.) Defendants point to the various declarations from Renaissance's former customers, none of whom state that they left Renaissance because of encouragement from Kurtz or Jarrett. (E.g., Docket No. 82, Benner Decl. ¶¶ 5,6,9,10; Van Raaij Decl. ¶¶ 5,6,15.)

### III.  DISCUSSION

**A.    Summary Judgment Standard**

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact." A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if it "might affect the outcome of the suit under governing law." Id.

---

[6]Kurtz concedes he made some reference to the possibility of working for the farms after he left, but he contends that he did so simply because he misunderstood the non-compete agreement. Once he became aware of the agreement, Kurtz indicated he could not work for them. (Docket No. 106-2, Kurtz Decl. ¶ 6.)

In deciding a motion for summary judgment, the evidence and the inferences drawn from the evidence must be "viewed in the light most favorable to the party opposing the motion." Addickes v. S.H. Kress and Co., 398 U.S. 144, 158-59, 90 S.Ct.1598, 26 L.Ed.2d 142 (1970). "Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991). The function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

**B.     Breach of Contract**

Under New York law, an action for breach of contract requires proof of: (1) a contract; (2) performance of the contract by one party; (3) breach by the other party; and (4) resulting damages. Rexnord Holdings, Inc. v. Bidermann, 21 F.3d 522, 525 (2d Cir. 1994). Defendants do not contest the first two elements. Rather, they assert that they did not breach either agreement and that they did not cause any damages.

It is undisputed that Defendants began a company engaged in a similar field as Plaintiff. Defendants admit they used their skills and abilities learned through the years to develop their new venture. (Docket No. 116-3, pp.197-200.) The SMRA prohibits this: "[Defendant] agrees that for a period of two years from the termination of his relationship with Renaissance . . . [he shall not] service, solicit the business of, make sales calls on, promote, market, or sell directly or indirectly any product or service similar to those of Renaissance."

Kurtz admits to soliciting four of Plaintiff's customers for his new business (Stardust Dairy, Joe Weaver, Van Raay, and Herman Lehman) and each of those farms informed Kurtz that they would follow him to his new venture. (Docket No. 116-2, Kurtz Dep. 106-

11

108.)  This alone is sufficient for a reasonable jury to conclude that Defendants breached the SMRA.

A reasonable jury could also link Patrick O'Brien to Jarrett in dealings that violate the SMRA. First, Jarrett purchased a copy of the program that he used to formulate diets for O'Brien. Jarrett also trained O'Brien on the software and went to O'Brien's office in Eden, New York to download profiles of ingredients to the new software to be used by O'Brien. (Docket No. 95-4, Exhibit 3, pp. 62, 97-99, 110-111, 116-118.)  O'Brien admits that the diets he formulated were identical or "plagiarized" from diets formulated by Jarrett for CCF. Jarrett also received a monthly commission check from O'Brien. Finally, the only diets that O'Brien formulated were for former Renaissance customers.

A reasonable jury may also find a breach in Jarrett's link to Jon Greenwood of Greenwood Diary. Greenwood states that he started to use O'Brien's services on the recommendation of Jarrett. (Docket No. 96-2, Exhibit 8, p. 24)  This could be easily construed by a jury as a "promotion . . . of a product or service similar to Renaissance."

Jarrett's similar dealings with Mike Maloney (Docket No. 95-5, Exhibit 4, pp. 55-58) also present a triable issue of fact as to whether Jarrett diverted customers away from Plaintiff in violation of the SMRA.

Concerning the RMA, although never defined within the agreement, confidential information may include both client lists and pricing information. See North Atlantic Instruments, Inc. v. Haber, 188 F.3d 38 (2d Cir. 1999). Recognizing an employer's legitimate interest in safeguarding their information, courts have enforced restrictive covenants to the extent necessary to prevent the disclosure or use of trade secrets or confidential customer information. Reed, Roberts Assoc. v. Strauman, 40 N.Y.2d 303, 308,


386 N.Y.S.2d 677, 353 N.E.2d 590 (1976).

Whether a plaintiff's customer list or other proprietary information constitutes a trade secret is ordinarily a triable issue of fact. Ashland Management Inc. v. Altair Investments NA, LLC, 59 A.D.3d 97, 869 N.Y.S.2d 465 (1st Dep't 2008) (collecting cases).

Here, issues of fact remain as to whether Defendant's took, deleted, or made use of any confidential information, and whether such information was confidential. Although Defendants maintain they took nothing confidential from Plaintiff's laptops and that their intentions were benign, the fact remains that they downloaded and deleted files that contained customer information. (Docket No. 94, Exhibit 34.) This raises a genuine issue, precluding summary judgment.

### 2. Causation Leading to Damages

Causation is an essential element of damages in a breach of contract action. A plaintiff must prove that a defendant's breach directly and proximately caused his or her damages. Wakeman v. Wheeler & Wilson Mfg. Co., 101 N.Y. 205, 209, 4 N.E. 264 (1886). "In the law of contracts, causation in fact is established if the defendant's breach of duty was a substantial factor in producing the damage." RCN Telecom Servs, Inc. v. Centre Street Realty, 156 F. Appx. 349, 351 (2d Cir. 2005) (citing Coastal Power Int'l. Ltd. v. Transcon. Capital Corp., 10 F.Supp. 2d 345, 366 (S.D.N.Y. 1998))

Defendant's maintain they are entitled to summary judgment because Plaintiff cannot prove causation and damages. Defendants maintain that they did not cause any of the twenty-one customers to leave Renaissance. In their view, customers leave for various reasons and in fact, many of the specific customers in this case declared that they left Renaissance for reasons other than Defendants' actions. (E.g. Docket No. 82, Benner

Decl. ¶¶ 5,6,9,10.) But, in a summary judgment context particularly, where a court's function is "issue-finding, rather than issue-determination", Plaintiff has raised sufficient questions of fact to warrant a trial. Johnson v. City of New York, 15 N.Y.3d 676, 684, 942 N.E.2d 219 (2010) (quoting Pirrelli v. Long Island. R.R., 226 A.D.2d 166, 166, 641 N.Y.S.2d 240 (1st Dep't 1996) (Jones, J., dissenting)).

The possibilities for logical inferences in this case are abundant. A reasonable jury may conclude that Defendants' mutual resignation, laptop purchases, computer downloads and erasures, software purchases, connections to O'Brien and Maloney, solicitation of Plaintiff's customers, "play diets," connections to CBI and Witmer's Feed, and frequent visits to former customers' farms lead to Plaintiff's loss of business.

Defendants rely heavily on the farmers' declarations, which reject culpability on the part of Kurtz or Jarrett. However, triable issues of fact are raised in the declarations and they do not consistently align with other evidence in the record. Tom Benner, for example testified that Kurtz had informed him that he left Renaissance a month or more after he did and that he learned of his departure from an outside source. (Benner Decl. ¶¶ 11,12.) Kurtz, however, testified that he personally told Benner he left in June 2006. (Docket No. 95, Exhibit 1.) Benner eventually used products from CBI. Despite Benner's assertions to the contrary, a logical jury could connect Benner to Kurtz to CBI. This is merely an example, factual disputes like these litter the record. It is the jury's unenviable domain to sort them out.

**C.    Breach of Duty of Loyalty**

New York law regarding disloyal or faithless performance of employment duties is grounded in the law of agency. Phansalkar v. Andersen Weinroth & Co., 344 F.3d 184 (2d

Cir. 2003); see Murray v. Beard, 102 N.Y. 505, 7 N.E. 553 (1886). Under New York law, an agent is obligated "to be loyal to his employer and is 'prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties.'" Western Elec. Co. v. Brenner, 41 N.Y.2d 291, 295, 392 N.Y.S.2d 409, 360 N.E.2d 1091 (1977) (quoting Lamdin v. Broadway Surface Adver. Corp., 272 N.Y. 133, 138, 5 N.E.2d 66 (1936)).

"When an employee engages in a business which, by its nature, competes with the employer's, a double breach of duty occurs. Not only is the principal deprived of the services for which he has contracted, but he finds these services turned against himself." Maritime Fish Prods., Inc. v. World-Wide Fish Prods., Inc., 100 A.D.2d 81, 88, 474 N.Y.S.2d 281 (1st Dep't 1984).

Defendants claim that Eastwood and Visser farms had their own reasons – apart from Kurtz – for using CBI instead of Renaissance. Visser stopped using Renaissance products in 2005 and Eastwood never used Renaissance.  Therefore, they state, Kurtz could not have been disloyal because these farms did not represent lost opportunities for Plaintiff. But it does not "make any difference that the services were beneficial to the principal, or that the principal suffered no provable damage as a result of the breach of fidelity by the agent." Feiger v. Iral Jewelry, Ltd., 41 N.Y.2d 928, 929, 394 N.Y.S.2d 626, 363 N.E.2d 350 (1977). It is undisputed that Kurtz, while employed by Renaissance, formulated diets for Eastwood and Visser for which he received checks from CBI, a competitor of Renaissance. Regardless of Defendants' contention that they were not responsible for lost business, a jury could find that Kurtz is liable of an unlawful "double breach." See Maritime Fish Prods 100 A.D.2d at 88; see also Soam Corp. v. Train Co., 202

A.D.2d 162 (1st Dep't 1994) (holding that an agent breaches his duty of loyalty when receiving commissions from a competitor of the principal).

According to Plaintiff, Kurtz also discussed with Larry Bock his intention of leaving Renaissance and stealing customers. If credited, a reasonable jury may deem this a disloyal act.

Further, Kurtz's and Jarrett's act of soliciting the help of Plaintiff's IT staff and downloading information from Plaintiff's computer onto personal laptops could be viewed as an act lacking in good faith and loyalty.

**D.    Tortious Interference with Contract**

To establish a claim for contract interference a plaintiff must show: (1) the existence of a valid contract with a third party; (2) defendant's knowledge of that contract; (3) defendant's intentional and improper procuring of a breach, and (4) damages. Llama Holding Co. v. Smith Barney, 88 N.Y.2d 413, 88 N.Y.2d 413, 668 N.E.2d 1370 (1996), Albert v. Loksen, 239 F.3d 256, 274 (2d Cir. 2001). Whether defendants intentionally procured the breach of a contract is typically a question of fact for a jury to decide. 24/7 Records, Inc. v. Sony Music Entertainment, Inc., 429 F.3d 39, 48 (2d Cir. 2005); U-Neek, Inc. v. Wal-Mart Stores, Inc., 147 F.Supp.2d 158, 177 (S.D.N.Y. 2001).

Defendants continue to maintain that they did not breach either agreement and that they therefore could not have interfered with each other's contract. However, the SMRA – an agreement for which each defendant was compensated – was meant to keep Defendants out of Plaintiff's business for two years. Plaintiff paints a picture, substantiated by sufficient facts, where Defendants acted in concert, encouraging and aiding each other along the way, in an effort to conceive and construct a new business in violation of that

agreement. If credited, a reasonable jury could conclude that Defendants' conduct was intentional, improper, and resulted in damages to Plaintiff.

**E.    Tortious Interference with Business Relationships[7]**

To make out a claim for tortious interference with business relationships, a plaintiff must demonstrate that the defendant acted with "wrongful means." NBT Bancorp v. Fleet/Norstar Fin. Group, 87 N.Y.2d 614, 621, 641 N.Y.S.2d 581, 664 N.E.2d 492 (1996). This is a more stringent standard than that used under tortious interference with contract. Id. A violation of a "duty of fidelity" has been found to meet the "wrongful means" test. Guard-Life v. S. Parker Hardware Mfg. Corp., 50 N.Y.2d 183, 428 N.Y.S.2d 628, 406 N.E.2d 445; Out of Box Promotions, LLC v. Koschitzki 55 A.D.3d 575, 866 N.Y.S.2d 677 (2d Dep't 2008).

On similar facts, the court in Koschitzki found that the defendant owed the plaintiff a duty of fidelity as a manager within the plaintiff company. Id. Here, Defendant's were high-level employees. Jarrett was trusted to assign and review projects, oversee nutritionists and develop and implement new products; he was second-in-command. Kurtz was a regional manager, responsible for overseeing a large portion of New York State. As such, Defendants owed Plaintiff a duty of fidelity. See Duane Jones Co. v. Burke, 306 N.Y. 172, 117 N.E.2d 237 (1954) (finding a duty of fidelity in the employer/employee relationship). Whether Defendants violated that duty is an issue of fact for the jury.

---

[7]Defendants continue to contend that they did not attempt to influence any Renaissance customer to leave Renaissance and therefore could not have interfered with Renaissance's business relationships. This Court has already addressed that issue.

## IV.  CONCLUSION

For the foregoing reasons, this Court finds that Defendants are not entitled to summary judgment.

## V.  ORDER

IT HEREBY IS ORDERED, that Defendants' Motion for Summary Judgment (Docket No. 74) is DENIED.

SO ORDERED.


Dated:  July 26, 2011
       Buffalo, New York

<div style="text-align:right">

<u>/s/William M. Skretny</u>
WILLIAM M. SKRETNY
United States District Court
Chief Judge

</div>